UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHRISTINE JACKSON,

        Petitioner,

                                  CASE NO. 2:08-CV-10094

v.                              CHIEF JUDGE GERALD E. ROSEN
                                   MAGISTRATE JUDGE PAUL J. KOMIVES

CLARICE STOVALL,

        Respondent.

_____/

## REPORT AND RECOMMENDATION

| | | |
|---|---|---|
| I. | RECOMMENDATION | 1 |
| II. | REPORT | 2 |
| | A. *Procedural History* | 2 |
| | B. *Factual Background Underlying Petitioner's Conviction* | 4 |
| | C. *Standard of Review* | 9 |
| | D. *Confrontation (Claims I & II)* | 11 |
| |    1. *Clearly Established Law* | 12 |
| |    2. *Analysis* | 15 |
| |       a. Background Relating to Wallace's Grand Jury Testimony | 15 |
| |       b. Testimonial Hearsay | 18 |
| |       c. Unavailability of Wallace | 20 |
| | E. *Ineffective Assistance of Counsel (Claim III)* | 22 |
| |    1. *Clearly Established Law* | 22 |
| |    2. *Analysis* | 23 |
| | F. *Prosecutorial Misconduct (Claim IV)* | 25 |
| |    1. *Procedural Default* | 25 |
| |    2. *Clearly Established Law* | 27 |
| |    3. *Analysis* | 27 |
| | G. *Recommendation Regarding Certificate of Appealability* | 31 |
| |    1. *Legal Standard* | 31 |
| |    2. *Analysis* | 32 |
| | H. *Conclusion* | 34 |
| III. | NOTICE TO PARTIES REGARDING OBJECTIONS | 34 |

\*      \*      \*      \*      \*

I.    RECOMMENDATION: The Court should deny petitioner's application for the writ of habeas corpus. If the Court accepts this recommendation, the Court should grant a certificate of appealability with respect to petitioner's confrontation claims, and should deny a certificate of appealability with respect to petitioner's ineffective assistance and prosecutorial misconduct claims.

II.     REPORT:

A.      *Procedural History*

        1.      Petitioner Christine Jackson is a state prisoner, currently confined at the Scott Correctional Facility in Plymouth, Michigan.

        2.      On April 20, 2001, petitioner was convicted of two counts of first degree murder, MICH. COMP. LAWS § 750.316(1)(a); and two counts of conspiracy to commit first degree murder, MICH. COMP. LAWS §§ 750.157, .316(1)(a), following a jury trial in the Wayne County Circuit Court. On May 7, 2001, she was sentenced to concurrent mandatory terms of life imprisonment without possibility of parole.

        3.      Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

        I.      THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN ADMITTING HEARSAY TESTIMONY, VIOLATING DEFENDANT-APPELLANT'S CONSTITUTIONAL RIGHTS.

                (1)     The Court erred in admitting the transcript of Angela Wallace's testimony from the California case.

                (2)     The Court erred in admitting the hearsay statements of Ronney Johnson and the testimony of Kelvin Garland.

                (3)     The improper admission of this hearsay testimony was prejudicial and cannot be considered harmless error.

        II.     THE TRIAL COURT ERRED IN ADMITTING THE IRRELEVANT VIDEO TRANSCRIPT OF WITNESS RONNIE JOHNSON AS EVIDENCE.

        III.    DEFENDANT-APPELLANT'S CONVICTION MUST BE REVERSED DUE TO PROSECUTORIAL MISCONDUCT.

        IV.     DEFENDANT-APPELLANT WAS DENIED HER RIGHT TO EFFECTIVE ASSISTANCE OF TRIAL COUNSEL.

        V.      THE TRIAL JUDGE VIOLATED DEFENDANT-APPELLANT'S RIGHTS

2

BY REFUSING TO ADMIT IMPEACHMENT EVIDENCE OFFERED BY THE DEFENSE.

VI.     THE COMBINED EFFECT OF THE MULTIPLE ERRORS DENIED DEFENDANT-APPELLANT HER RIGHTS TO DUE PROCESS AND A FAIR TRIAL.

The court of appeals found no merit to petitioner's claims, and affirmed her conviction and sentence.

*See People v. Jackson*, No. 236360, 2004 WL 2913643 (Mich. Ct. App. Dec. 16, 2004) (per curiam).

4.      Petitioner sought leave to appeal these issues to the Michigan Supreme Court. The

Supreme Court denied petitioner's application for leave to appeal in a standard order. *See People v.*

*Jackson*, 474 Mich. 871, 703 N.W.2d 812 (2005).

5.      On December 15, 2006, petitioner filed a motion for relief from judgment in the trial

court pursuant to MICH. CT. R. 6.500-.508, raising the following claims:

I.      DEFENDANT WAS DEPRIVED THE SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHEN HER APPELLATE ATTORNEY FAILED TO ADEQUATELY BRIEF THE QUESTION OF WHETHER IMPERMISSIBLE DOUBLE HEARSAY STATEMENTS WERE ADMITTED AGAINST HER AT TRIAL.

II.     DEFENDANT WAS DEPRIVED THE SIXTH AMENDMENT RIGHT TO BE CONFRONTED BY THE WITNESSES AGAINST HER WHEN THE TRIAL COURT ADMITTED STATEMENTS MADE BY HER FORMER ATTORNEY, ANGELA WALLACE, DURING AN UNRELATED FEDERAL PROCEEDING.

On January 5, 2007, the trial court denied petitioner's motion for relief from judgment on the merits.

The Michigan Court of Appeals and Michigan Supreme Court denied petitioner's applications for

leave to appeal in standard orders, based on petitioner's "failure to meet the burden of establishing

entitlement to relief under MCR 6.508(D)." *People v. Jackson*, 480 Mich. 1003, 742 N.W.2d 379

(2007); *People v. Jackson*, No. 275785 (Mich. Ct. App. May 18, 2007).

6.      Petitioner, through counsel, filed the instant application for a writ of habeas corpus on

January 7, 2008. As grounds for the writ of habeas corpus, she raises the confrontation, ineffective assistance of appellate counsel, and prosecutorial misconduct claims that she raised in the state courts.

7.    Respondent filed her answer on July 16, 2008. She contends that petitioner's first confrontation claim is without merit, and that her remaining claims are procedurally defaulted and without merit.

8.    Petitioner filed a reply to respondent's answer on September 2, 2008.

B.    *Factual Background Underlying Petitioner's Conviction*

Petitioner's conviction arises from the shooting deaths of Kevin Garland and Mary Ann Simmons on October 16, 1998, by her codefendant Timothy Landers and Eric Wills. Although at points argumentative, petitioner's brief on direct appeal accurately summarizes the evidence adduced at trial:

> The theory of the prosecution was that on October 7, 1998, Mike McConico arranged to purchase three kilograms of cocaine from Landers. In reality, McConico planned to rob Landers and shoot him. McConico did rob and shoot Landers, along with a person identified only as "Bill." The shot hit Landers in the leg and he survived.
>
> The prosecution theorized that Landers blamed Kevin Garland for the incident, as Garland introduced McConico to Landers. To avenge the shooting, the prosecution theorized that Landers, accompanied by Jackson, Eric Wills and Ronney Johnson, tracked down and killed Kevin Garland, and that later Landers had Eric Wills, accompanied by Jackson, killed Mary Ann Simmons. Simmons was Kevin Garland's girlfriend and someone who could identify both Landers and Jackson.
>
> The defense theory was that Ronney Johnson (hereinafter "Johnson"), a drug dealer from Los Angeles who owned the stolen drugs, and for whom Landers worked as a courier, flew to Detroit, was later joined by his hit man Eric Wills, and that the two of them were responsible for the murders.
>
> The prosecution relied chiefly on four witnesses, without any one of whom they could not have succeeded. The first witness was Ronney Johnson. Known as "Uncle" to family and friends (T II, 192, 201), Johnson claimed to be an eyewitness to the shooting of Kevin Garland, as well as being present when Landers instructed Eric Wills to "take care" of Mary Ann Simmons. (T II, 97). As to Garland, Johnson claimed to have been in a van with Landers, Jackson and Eric Wills when the other occupants tracked down Garland at a nightclub, abducting him and forcing him at gunpoint to lead them to the residence of McConico. (T II, 77). After being directed

to an apartment complex in Southfield where McConico allegedly lived, Garland made a break and Johnson claims Landers shot Garland several times from both inside and outside the van. Johnson claims that Eric Wills was ordered to go into a vestibule where Garland was laying to "finish the job." (T II, 96).

Later that evening, after renting a motel room, Johnson claims that Landers asked him to kill Mary Ann Simmons. (T II, 97, 98). Johnson claims to have refused and instead Eric Wills, accompanied by Jackson, went to accomplish the task. (T II, 98). They returned and Mr. Wills acknowledge in Johnson's presence that he had in fact done so. (T II, 99). Johnson was the only eyewitness and the only person with firsthand information available to testify against either defendant on both of these murders.

The prosecution also relied heavily on the testimony of Kelvin Garland, the brother of the deceased Kevin Garland. Kelvin Garland was necessary to establish a motive for the killing. In order to do so, over strenuous objection (T III, 22), Kelvin Garland was allowed to quote both his deceased brother and Mary Ann Simmons during his testimony. Kelvin Garland claimed that he had purchased drugs from McConico and a California connection. (T VII, 51). He claimed that his brother told him someone named "Christine" brought the drugs to Detroit from California and that she worked with a person named "T," later identified as Landers. (T VII, 52). Further, Kelvin Garland claimed that Mary Ann Simmons had driven him to the airport on one occasion to pickup Jackson, and claimed to have been told by Ms. Simmons that at least twenty-five kilograms of cocaine had been brought in to Detroit from California as part of a drug enterprise. (T VII, 52-54).

Mike McConico admitted to having arranged to have Landers robbed and shot. While McConico did not claim to have ever met Jackson, he does claim to have known Landers through Kevin Garland in relation to drug transactions. (T IV, 136). That was how he was able to arrange the robbery and attempted murder. In testifying to other drug transactions involving Landers, McConico never mentions Jackson. (T IV, 137). No request to restrict McConico's testimony solely to Landers was ever made by counsel for Jackson, nor was there ever a request for severance based on the testimony of McConico and others about their drug dealing activities with Landers, in which Jackson was not alleged to have participated.

Also essential to the prosecution's case was the testimony of Angela Wallace. Wallace was an attorney who practiced in Los Angeles, California. (T IV, 108). The case against Jackson began when Johnson was arrested on a concealed weapons charge after returning to Detroit sometime after the murders. According to Johnson, his mother told him that Ms. Wallace had come to her home in Los Angeles and expressed that Johnson was in a lot of trouble (T IV, 41). According to Wallace, she was asked to provide representation to Johnson on the weapons charge. (T IV, 109). An attorney named Clarence Tucker appeared at the arraignment and attempted to enter his appearance for Johnson. The arraignment was videotaped. (T IV, 107).

Unbeknownst to anyone, Johnson was already negotiating a deal to cooperate with the Wayne County Prosecutor's Office on the murder investigation in exchange for, among other things, the dismissal of the weapons charge. Wayne County Assistant Prosecuting Attorney Rollstin, who was the prosecutor in this case from the

outset through the end of the second trial, claimed that Johnson did not wish any legal representation. In so doing, he learned that Ms. Wallace was the attorney who had hired Mr. Tucker to appear on behalf of Johnson.

Mr. Rollstin subpoenaed Ms. Wallace to testify at the murder trial. Ms. Wallace maintained that she had no idea Johnson's problems were at all related to the murder investigation. (T IV, 112). Ms. Wallace further maintained that she had not been employed by Jackson to represent Johnson, but rather had been asked to do so by a "family member." (T IV, 109). Finally, Ms. Wallace maintained that she had never represented Jackson before her attempt to represent Johnson at the aforementioned arraignment. (T IV, 109). Her subsequent representation of Jackson in this case was unrelated: she knew of no connection between the cases. (T IV, 130, 131). Following a very cursory cross-examination, Ms. Wallace was allowed to leave.

The next day, Mr. Rollstin brought to defense counsel and the Court's attention that he had obtained a transcript of proceedings that had taken place in a United States District Court in California. It contained testimony by Angela Wallace and included her claiming to have represented Jackson at a time when Ms. Wallace had maintained she had not known Jackson. It presented an obvious contradiction of Ms. Wallace's testimony, and Mr. Rollstin wanted it to be admitted and read to the jury.

After defense counsel objected to the fact that they had not been provided previously with the transcript, and that Ms. Wallace had not been given an opportunity to explain her prior testimony, the Court instructed the prosecution to bring Ms. Wallace back to court. Ms. Wallace, however, had absconded and could not be found. After satisfying itself that the prosecution had made its best effort to locate Ms. Wallace, the Court allowed the testimony of Ms. Wallace in the California federal court proceeding to be read to the jury. (T VIII, 25).

The defense maintained that the Court was allowing impeachment of a witness on a collateral matter without an opportunity for cross-examination (in fact Ms. Wallace had never represented Jackson). The Court first ruled that the transcript could only be used for impeachment, (T VII, 17), but later allowed the prosecution to argue that it showed Jackson's consciousness of guilt. In ruling on Jackson's Motion for New Trial, the trial court ruled the transcript was properly used substantively (Motion T, 193-196). The prosecution was allowed to (and in fact did) argue that the jury could find by Ms. Wallace's "perjury," that Jackson had indeed hired her to keep Johnson from providing information that could be used against her in the murder investigation.

Further, the prosecution sought to introduce the actual videotape of the arraignment at which Mr. Tucker attempted to appear on behalf of Johnson, having been hired by Angela Wallace to do so, with Assistant Prosecuting Attorney Rollstin arguing that Johnson did not want the representation, something Johnson confirmed at trial. While Judge Chylinski had specifically ruled that the videotape of this arraignment was cumulative and not admissible in the first trial of this case, Judge Colombo ruled otherwise and allowed the videotape to be viewed by the jury. (T IV, 107).

. . . .

Ronney Johnson . . . admitted under cross-examination to having told material

lies in the first statement he made on November 10, 1998. Among other things, he told the police that the van which was used in the killing of Kevin Garland was burgundy, when it was white. He claimed they had gone to Ms. Simmons' house both before and after the killing. He also claimed there was a chase of a black Cadillac with shots fired at the Cadillac. Johnson later admitted all of these statements were complete fabrications. He claimed that all the lies were out of fear of Jackson, Landers and Wills, despite the fact that he was in police custody. (T II, 115-118, 119-121, 124-127; T III, 190-192).

Johnson also admitted to making material false statements in his second statement given the same day. (T III, 129-133). Johnson gave a third statement on November 12, 1998, where he admitted to making more false statements. (T III, 217-219). In a separate written statement given to the Southfield Police, also on November 12, 1998, he gave yet another version of the events.

On March 16, 1999, Johnson gave at least his fourth statement, this time to Sergeant Kinney of the Detroit Police Department. He continued to maintain that the group was heading towards Simmons' house, had chased and shot at a black Cadillac and that Landers believed the driver of the Cadillac was the person who robbed him. (T II, 139-140). McConico admitted to having a black Cadillac. (T IV, 33-35). Johnson later admitted that this story, which he had persisted in giving through all of his statements, was totally fictitious.

Johnson was also confronted with numerous false statements made under oath at the preliminary examination and at the first trial. Johnson admitted that he made false statements even after signing an agreement that conditioned his "deal" on his telling the truth. Despite having admitted lying in the various statements and even under oath, Johnson was still given the benefit of having all charges against him dismissed. (T II, 144-150).

Each and every time Johnson was confronted with having intentionally lied, he maintained that he did so out of fear and to protect his family, despite the fact that he was in protective custody, had never expressed a desire to have his family protected, that the lies did nothing to protect him or his family, or that the lies did nothing to make Jackson any less or any more guilty than if he had told his version of the truth.

The impeachment of Johnson did not rest merely on his inability to make the same statement twice, despite having told the story on at least a half a dozen occasions, nor on his admission of lies in his statements and prior testimony.

Crystal Washington, Mary Ann Simmons' roommate, told the investigating officers that there was a knock on the door before Simmons was killed and when she asked who was there heard someone say "Uncle." (T VII, 25). Johnson admitted being called "Uncle" by family and friends. (T II, 192, 201). When Ms. Simmons opened the door, the only thing Ms. Washington could identify was a black leather jacket. (T VI, 40). Johnson admitted that while in Detroit he wore a black leather jacket. (T III, 88).

Johnson claimed that Landers pistol whipped Kevin Garland. (T II, 80, T III, 64, 164). The medical examiner found no evidence to verify this claim. (T VIII, 151). Although denying under oath at the Preliminary Examination doing so, Johnson

admitted purchasing bullets used in the murders, but claimed it was because he was scared and was the only person with proper identification. (T II, 237-245). He offered no explanation why, while in the K-Mart to purchase the bullets, he did not attempt to flee or notify security. The same was true about several instances where Johnson could have fled, including while left in the motel room with only a crippled Landers. Johnson admitted he could have fled or called for help. (T IV, 21-22).

Johnson denied ever buying a BMW for a woman, but later admitted that a girlfriend, Aretha Bufford, did have his BMW. (T II, 165, 166). He was caught in numerous other false statements regarding his finances, dealing with cars and with, among other people, Landers. He tried to justify his situation by claiming that he had "gotten all the lies out," and while he had not always told the "whole truth," he did not feel less than the whole truth was a lie. As to some testimony, he admitted having told only partial truths. (T II, 153, 158-163, 166-177, 174). Everything he did was "against his will." (T III, 62, 63).

While expressing a fear of both Jackson and Landers and claiming to be financially destitute, he admitted voluntarily attending a birthday party with Landers and Jackson in December 1998, after the homicides. Photographed laughing and wearing apparently very expensive jewelry, Johnson maintained that he attended the party only because "they" knew where he lived. (T II, 176-180). Johnson was also caught in an inconsistent statement about whether or not he had ever met Mr. Wills before he arrived in Detroit in 1998. (T II, 181-182).

Johnson admitted that he was involved in drug dealing before he met Jackson, but denied he was currently involved. Following a prison term, Johnson wanted only to create a record company. (T II, 196). While maintaining that he was not involved in drugs, he nonetheless claimed that Jackson and Landers were involved, and that Landers was a primary source of the funding he sought for his record company. (T II, 197-200).

Kelly Meyers testified that she knew Jackson and Landers and had stayed at Jackson's residence in Las Vegas in October of 1998. (T VI, 158-162). One of the persons that she met was called "Uncle Q," who she identified as Johnson. (T VII, 164). Johnson admitted having been in Las Vegas during that same period of time.

William Farmer had testified for the prosecution in the first trial, and was found to be unavailable at the second trial. His testimony from the prior trial was read to the jury. He claimed that he met Landers while working as a cab driver. Landers requested to use Mr. Farmer's house to count some money. That was the night Landers was shot. Mr. Farmer was in his bedroom when he heard shots and ran to the basement in fear. He was to be paid Fifth Dollars ($50.00) for allowing use of his house. (T IV, 134-138, 143-145). An unidentified woman later questioned him about the events, but he could not identify that person as Jackson, and never saw Landers after that day. (T IV, 139). Mr. Farmer did indicate that someone claiming to be Landers' uncle came to see him and wanted to know what happened. (T IV, 148-150). While unable to identify Johnson as that person, Farmer described the uncle as immaculately dressed, wearing a large gold chain with a gold cross and diamonds on it, along with a gold watch. (T IV, 150-151). Johnson at first did not recall, but later admitted visiting Farmer's home on Tireman. (T III, 127). The picture of Johnson at

the birthday party had him wearing similar, if not the same, jewelry described by Mr. Farmer. (Motion T 107; T VIII, 123).

. . . .

. . . . [Kelvin] Garland was granted immunity for his testimony from both the Wayne County Prosecutor's Office and the United States Attorney's Office. (T VII, 49). He admitted that he sold cocaine and knew that his deceased brother Kevin Garland sold cocaine. (T VII, 50). Kelvin Garland had been convicted of several felonies and was in prison for violation of parole at the time he testified under immunity. (T VII, 75). His convictions dealt with dishonesty, theft, escape and weapons. (T VII, 57, 75). Kelvin Garland offered very little substantive evidence other than quoting statements that he attributed to his deceased brother and to Ms. Simmons. He also admitted being a cocaine dealer, that he had seen Landers on one occasion and that he knew, through Ms. Simmons' statements, that Jackson was involved in drugs. (T VII, 52-57).

McConico was also granted immunity from both the Wayne County Prosecutor and the United States Attorney's Office. (T IV, 135, 150). This is the man who admitted to armed robbery and attempted murder in arranging to have Landers robbed and shot. He admitted earning money from selling drugs since he was thirteen years old (he was twenty-nine years old at the time he testified), and also admitted that in October of 1998 he was selling about a kilo of cocaine a week. (T IV, 136). McConico further admitted taking part in numerous drug transactions with Kevin Garland and claimed that he was introduced to Landers by Kevin Garland. (T IV, 137). McConico arranged to purchase three kilos of cocaine from Landers (T IV, 137), but as Landers walked to the porch with a duffle bag, a person McConico could identify only as "Bill" started shooting at Landers. (T IV, 144). After stealing the cocaine and leaving Landers wounded, McConico claimed to have sold two of the kilos, kept the proceeds, and gave the other kilo to Bill. (T IV, 168). McConico maintained that Bill was now dead and that he never knew his last name. (T IV, 166). He was not prosecuted for the attempted murder of Landers, the large-quantity drug sales that were life offense, or the numerous other crimes to which he admitted, including money laundering and income tax fraud. (T IV, 166, 170).

Def.-Appellant's Br. on Appeal, in *People v. Jackson*, No. 236360 (Mich. Ct. App.), at 1-12.

C.    *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996). *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the

Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp.2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

D.     *Confrontation (Claims I & II)*

In her first two claims, petitioner contends that she was denied her right to confront Angela Wallace by the introduction, after she had testified and could no longer be found, of her testimony before a federal grand jury. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.     *Clearly Established Law*

The Sixth Amendment provides, in relevant part: "In all criminal prosecutions, the accused

shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. The Confrontation Clause is applicable to the states through the Fourteenth Amendment's Due Process Clause. *See Pointer v. Texas*, 480 U.S. 400, 406 (1965). At the time of petitioner's trial, the standard governing the admissibility of hearsay statements under the Confrontation Clause was that set forth in *Ohio v. Roberts*, 448 U.S. 56 (1980). In *Roberts*, the Court explained that the underlying purpose of the Confrontation Clause is similar to that of the hearsay rule, *i.e.*, to exclude unreliable, out-of-court statements in criminal proceedings. Thus, the Court reasoned:

> In sum, when a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate "indicia of reliability." Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.

*Roberts*, 448 U.S. at 66. As the Court explained in *Roberts*, reliability is inferred if the evidence was admitted pursuant to a firmly rooted hearsay exception. The theory behind this presumption is that these firmly rooted exceptions represent judgments, based on history and practice, that statements made in certain circumstances are inherently trustworthy such that the "adversarial testing [embodied in the Confrontation Clause] would add little to [their] reliability." *Idaho v. Wright*, 497 U.S. 805, 821 (1990). Thus, a hearsay exception is "firmly rooted" if it "rest[s] upon such solid foundations that admission of virtually any evidence within [the exception] comports with the substance of constitutional protection." *Roberts*, 448 U.S. at 66 (internal quotation omitted).

In *Crawford v. Washington*, 541 U.S. 36 (2004), decided shortly after petitioner's trial, the Supreme Court abrogated *Roberts* as applied to testimonial hearsay statements. After surveying the historical development of the Confrontation Clause and the jurisprudence interpreting it, the Supreme Court concluded that, under a proper understanding of the Clause, "[t]estimonial statements of

witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Crawford*, 541 U.S. at 59. The Court then explained that *Roberts*'s allowance of testimonial statements based on their reliability, where there has been no opportunity for cross-examination of the declarant, departed from this proper understanding of the Confrontation Clause. *See id*. at 60-68. The Court therefore abrogated *Roberts* as applied to testimonial hearsay statements, concluding that "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Id*. at 68-69. In *Crawford*, the Supreme Court left "for another day any effort to spell out a comprehensive definition of 'testimonial.'" *Crawford*, 541 U.S. at 68. The Court did, however, provide some guidance. Specifically, the Court provided three possible "formulations of th[e] core class of 'testimonial' statements":

> [1] *ex parte* in-court testimony or its functional equivalent–that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; [2] extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; [and] [3] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

*Id*. at 51-52 (internal quotations and citations omitted). While the Court declined to adopt any of these three formulations, the Court noted that the term "testimonial," whatever else it may cover, "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Crawford*, 541 U.S. at 68.

*Crawford* establishes a confrontation rule with respect to "testimonial" statements; it has no application to non-testimonial hearsay. The question therefore remains whether *Roberts* has any applicability to this case to the extent that the statements admitted at petitioner's trial were not

testimonial hearsay under *Crawford*. Because it is now clear that the Confrontation Clause is not at all concerned with non-testimonial hearsay, the Court should conclude that *Roberts* has no application here. In *Crawford*, the Court suggested, but did not definitively rule, that the Confrontation Clause is limited to regulating the introduction of testimonial hearsay, and has no application at all to the admission at trial of non-testimonial hearsay. The Court explained that "[w]here nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law–as does *Roberts*, and as would an approach that exempted all such statements from Confrontation Clause scrutiny altogether." *Crawford*, 541 U.S. at 68. Immediately following *Crawford*, the Courts concluded that *Roberts* remained applicable to non-testimonial hearsay, observing:

> [t]he lynchpin of the *Crawford* decision thus is its distinction between testimonial and nontestimonial hearsay; simply put, the rule announced in *Crawford* applies only to the former category of statements. . . . [U]nless a particular hearsay statement qualifies as "testimonial," *Crawford* is inapplicable and *Roberts* still controls.

*United States v. Hendricks*, 395 F.3d 173, 179 (3d Cir. 2005); *see also*, *Horton v. Allen*, 370 F.3d 75, 83-84 (1st Cir. 2004); *United States v. Johnson*, 354 F. Supp. 2d 939, 964 (N.D. Iowa 2005); *United States v. Savoca*, 335 F. Supp. 2d 385, 391-92 (S.D.N.Y. 2004). Regardless of whether this reading of the *Crawford* dictum was correct, the Supreme Court has since clarified that the Confrontation Clause is simply not implicated by the introduction of non-testimonial hearsay. In *Davis v. Washington*, 547 U.S. 813 (2006), the Court explicitly addressed this question of "whether the Confrontation Clause applies only to testimonial hearsay," *id*. at 823, and in doing so abrogated *Roberts* in whole. The Court noted that the answer to this question was suggested in *Crawford*, when the *Crawford* decision explained that the Confrontation Clause focuses on "witnesses" who give "testimony." *Id*. at 823-24 (discussing *Crawford*, 541 U.S. at 51). The *Davis* Court explained that

"[a] limitation so clearly reflected in the text of the constitutional provision must fairly be said to mark out not merely its 'core,' but its perimeter." *Id*. at 824  Thus, where nontestimonial hearsay is at issue, the Confrontation Clause is not implicated at all, and need not be considered.  *See Whorton v. Bockting*, 549 U.S. 406, 420 (2007) ("Under *Roberts*, an out-of-court nontestimonial statement not subject to prior cross-examination could not be admitted without a judicial determination regarding reliability.  Under *Crawford*, on the other hand, the Confrontation Clause has no application to such statements and therefore permits their admission even if they lack indicia of reliability."); *United States v. Pugh*, 273 Fed. Appx. 449, 454 (6th Cir. 2008); *United States v. Feliz*, 467 F.3d 227, 231 (2d Cir. 2006).

2. *Analysis*

*a. Background Relating to Wallace's Grand Jury Testimony*

Before analyzing petitioner's claim, it is necessary to provide some background relating to Wallace's trial testimony and the introduction of her grand jury testimony.  At trial, the prosecution theorized that petitioner, a resident of California, hired Wallace, a California attorney, to represent Johnson in connection with a weapons charge in Michigan, in order to exert control over Johnson and keep him from implicating her in the murders for which she was ultimately convicted.  Johnson testified at trial that shortly after the murders he, petitioner, and Landers drove to California in a van.  A week later, at Landers's request, he and petitioner flew back to Michigan.  He rented a van to move some furniture for petitioner, and while driving the van was stopped by the police, who discovered a gun in the glove box.  He was arrested on a gun possession charge.  *See* Trial Tr., Vol. II, at 99-112. After his arrest on this charge, his mother informed him that Wallace came to her house and asked if she had heard from Johnson.  When asked by Johnson's mother, Wallace indicated that Johnson was "in big trouble."  At his arraignment, attorney Clarence Tucker appeared to represent him, but he

declined the representation.  *See id.*, Vol. IV, at 39-46.  The trial court admitted a transcript of the arraignment.

Angela Wallace testified that she did not meet petitioner until February 1999, when she was retained to represent petitioner in the murder case.  In October 1998, she testified, she was contacted by Johnson's nephew to represent him in the gun case in Michigan.  She in turn contacted Tucker, whom she knew from a previous case.  Although she was a California attorney, she did not find it unusual that she was asked to represent Johnson in Michigan because his mother lived close to her office.  Because Johnson declined her representation, she never met with him.  Wallace testified that she had not met petitioner or anyone in petitioner's family prior to being retained in the murder case, and denied that petitioner had asked her to represent Johnson in the gun case.  Following the prosecutor's direct examination, Wallace was excused.  *See id.*, Vol. IV, at 109-33.

The following day, the prosecutor informed the court that he had been in contact with an Assistant United States Attorney in California, who had handled a federal indictment against petitioner.  In this proceeding, the prosecutor was informed, Wallace had testified that she had known petitioner since at least March 1998, contrary to her trial testimony in petitioner's murder trial.[1]  The prosecutor asked for leave to add DEA agent Michael Delaney, the lead investigator in the California case, as a witness.  Counsel had no objection to the addition of Delaney, but requested a copy of the transcript of Wallace's testimony in the California case.  Counsel for Landers, petitioner's co-defendant, argued that Wallace had to be recalled to the stand before the prior testimony could be used for impeachment.  The trial court adjourned so that a transcript of the California testimony could be obtained.  *See id.*, Vol. V, at 29-60.

---

[1]It appears that Wallace gave her prior testimony in a grand jury proceeding.

The trial continued on the following Monday, at which time the prosecutor informed the court that on the previous Friday he contacted Wallace and told her that the court had issued another subpoena for her to testify and that he would send her a travel itinerary. Wallace agreed to return. On Saturday, the prosecutor attempted to contact Wallace at her home, but Wallace's sister informed the prosecutor that she had gone to visit their father in Texas. She was unable or unwilling to provide the prosecutor with a phone number or address in Texas where Wallace could be reached. He left the travel itinerary and his phone number with Wallace's sister, who promised to forward them to Wallace. The prosecutor was also unable to reach Wallace on her cell phone. On Sunday, the prosecutor again called Wallace's home, and another sister again informed the prosecutor that Wallace was visiting their father in Texas. The prosecutor again repeatedly tried to contact Wallace on her cell phone. On Monday, the day trial resumed, the prosecutor faxed a copy of the itinerary to Wallace's office. However, because Wallace had broken off contact, the prosecutor did not expect her to appear the following day. The prosecutor informed the court that he had received a copy of Wallace's testimony in the California case, and asked that he be allowed to introduce the testimony without first confronting Wallace and giving her an opportunity to explain or deny the prior testimony. Counsel for Landers argued that the prosecutor had created this problem himself by not securing the transcript from the California trial before questioning Wallace and then releasing her from the first subpoena. *See id.*, Vol. VI, at 6-20. The following day, the prosecutor informed the court that Wallace indeed failed to arrive on the flight for which he had purchased her a ticket, and the trial court ruled that the prosecutor would be permitted to introduce Wallace's testimony from the prior trial. *See id.*, Vol. VII, at 10-17.

### b. Testimonial Hearsay

Petitioner contends that Wallace's prior grand jury testimony constituted testimonial hearsay,

and thus that its admission violated his right to confront Wallace. The Michigan Court of Appeals rejected this claim, concluding that because the prior testimony was introduced for the limited purpose of impeaching Wallace's testimony, its introduction "did not contravene [petitioner]'s confrontation rights because the Confrontation Clause does not bar the use of testimonial statements for a purpose other than to establish the truth of the matter asserted." *Jackson*, 2004 WL 2913643, at *1, slip op. at 2. The Court should conclude that this determination was reasonable, and thus that petitioner is not entitled to habeas relief on this claim.

Under the universal understanding of the hearsay rule, hearsay testimony consists of out of court statements by a declarant other than the witness testifying which are offered in evidence to prove the truth of the matter asserted in the statement. Where non-hearsay is at issue, however, the Confrontation Clause is simply not implicated. As the *Crawford* Court itself recognized, "[t]he Clause . . . does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Crawford*, 541 U.S. at 59 n.9 (2004) (citing *Tennessee v. Street*, 471 U.S. 409, 414 (1985)). Thus, "admission of a testimonial statement in and of itself is not enough to trigger a violation of the Confrontation Clause. Instead, the statement must be used as hearsay–in other words, it must be offered for the truth of the matter asserted." *United States v. Pugh*, 405 F.3d 390, 399 (6th Cir. 2005). The Michigan Court of Appeals's determination that the evidence was not offered to prove the truth of the matter asserted was a reasonable one. The prosecutor's arguments in favor of admission explicitly sought admission solely for the purpose of impeaching Wallace's trial testimony that she had not known petitioner prior to February 1999. And the prosecutor explicitly argued for admission under MICH. R. EVID. 613(b), which governs the admission of extrinsic evidence of a witness's prior inconsistent statement for purposes of impeachment. Further, immediately prior to the reading of the transcript the trial court gave an instruction to the jury that thrice informed the jury

that this statement could be used only to judge the credibility of Wallace, and not to prove any facts stated in the statement. *See* Trial Tr., Vol. VIII, at 23-24. It is well established that a court must presume that a jury follows the instructions given by the trial court. *See Richardson v. Marsh*, 481 U.S. 200, 206 (1987); *see also*, *Shannon v. United States*, 512 U.S. 573, 585 (1994); *United States v. Olano*, 507 U.S. 725, 740 (1993); *Francis v. Franklin*, 471 U.S. 307, 324 n.9 (1985). Because of this presumption, and because Wallace's prior testimony was explicitly admitted for purposes of impeachment, the prior testimony was offered to prove the truth of the matter asserted in the statement. And it follows, therefore, that the admission of the statement did not violate the Confrontation Clause. *See United States v. Acosta*, 475 F.3d 677, 683 (5th Cir. 2007); *Adams v. Holland*, 168 Fed. Appx. 17, 20 (6th Cir. 2005).

Petitioner argues that, notwithstanding that the statement was admitted for a non-hearsay purpose, the Confrontation Clause is still implicated because Wallace's grand jury testimony had no impeaching value unless the jury accepted it as true, and thus it was the equivalent of a statement offered to prove the truth of the matter asserted. *See* Pet'r's Reply Br., at 6-7 ("The problem, however, is that Wallace's grand jury testimony had to be accepted as true in order for it to have impeaching value. . . . Wallace's statement to the grand jury . . . had no tendency to undermine her credibility as to the assertion that she did not represent Jackson until four months after Ronnie Johnson was charged *unless* the jury first accepted the grand jury testimony as true."). This argument is without merit. The impeaching value of a prior inconsistent statement comes not from the fact that the prior statement is true and the later statement is false, but from the very fact of inconsistency. The inconsistency itself calls into question the veracity of the witness, and the jury need not accept as true the prior statement in order to conclude that the later trial testimony is not worthy of belief. *See United States v. Bao*, 189 F.3d 860, 866 (9th Cir. 1999) ("A prior inconsistent statement is admissible

to raise the suggestion that if a witness makes inconsistent statements, then his entire testimony may not be credible; such an inference does not depend on whether either the prior statement or the subsequent in-court statement is true."); 1 MCCORMICK ON EVIDENCE § 34 ("The attack by prior inconsistent statement is not based on the theory that the present testimony is false and the former statement true. Rather, the attack rests on the notion that talking one way on the stand and another way previously is blowing hot and cold, raising a doubt as to the truthfulness of both statements."). Thus, the jury need not have accepted as true Wallace's grand jury testimony in order for it to have impeaching value, and petitioner's argument to the contrary does not alter the Confrontation Clause analysis. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on her confrontation claim.[2]

### c. Unavailability of Wallace

Petitioner also claims that the admission of Wallace's grand jury testimony to impeach her trial testimony violated her confrontation rights because the prosecution failed to show that Wallace was "unavailable." This claim is without merit.

Under *Crawford*, the admission of testimonial hearsay violates the Confrontation Clause unless (1) the witnesses were unavailable to testify, and (2) petitioner had the opportunity to cross-examine them. *See Crawford*, 541 U.S. at 68 ("[w]here testimonial evidence is at issue, . . . the Sixth Amendment demands . . . [both] unavailability and a prior opportunity for cross-examination."); *see also*, *United States v. McCaney*, 177 Fed. Appx. 704, 708 (9th Cir. 2006) ("In a criminal trial, prior

---

[2]Petitioner also argues that, regardless of the reason for its admission, Wallace's prior testimony was used as substantive evidence by the prosecutor during closing argument. This argument does not raise a claim under the Confrontation Clause, but rather presents a separate claim of prosecutorial misconduct, which is discussed below. *See Adams*, 168 Fed. Appx. at 20 (claim that petitioner's confrontation rights were violated because prosecutor made substantive use of impeachment evidence was a separate claims that "should have been . . . brought as prosecutorial misconduct.").

testimony of a witness may be admitted against a defendant consistent with the Sixth Amendment's Confrontation Clause if (1) the prosecution shows that the witness is unavailable, as it did here; and (2) the defendant had a prior opportunity to cross-examine the witness."). In determining whether a witness is "unavailable," the definition of "unavailability" in Rule 804(a) is a useful guide. *See United States v. Tirado-Tirado*, 563 F.3d 117, 123 n.4 (5th Cir. 2009); *Haggins v. Warden, Fort Pillow State Farm*, 715 F.2d 1050, 1055 (6th Cir. 1983).[3] Under Rule 804(a), a witness is unavailable when the prosecution is "unable to procure [her] attendance . . . by process or other reasonable means." MICH. R. EVID. 804(a)(5); FED. R. EVID. 804(a)(5). In order for a witness to be "unavailable" for constitutional purposes, the proponent of the evidence must have undertaken " 'good faith efforts" ' to procure the subject witness's attendance. *See Roberts*, 448 U.S. at 74-75 ("'The lengths to which the prosecution must go to produce a witness ... is a question of reasonableness.' The ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness."); *California v. Green*, 399 U.S. 149, 189 (1970); *Winn v. Renico*, 175 Fed. Appx. 728, 733 (6th Cir. 2006).

Petitioner argues that Wallace was not "unavailable" in the constitutional sense because she was at trial, and the prosecutor could have questioned her regarding her association with petitioner at that time. The question of Wallace's availability, however, is irrelevant. Unavailability and prior opportunity for cross-examination are factors that determine the admissibility of testimonial hearsay. Here, as explained above, Wallace's prior testimony did not constitute hearsay because it was not offered to prove the truth of the matter asserted. Thus, her availability or unavailability was

---

[3]Although *Crawford* altered the Confrontation Clause analysis, it did not alter the definition of "unavailability" for confrontation purposes, and pre-*Crawford* cases discussing unavailability remain good law. *See Tirado-Tirado*, 563 F.3d at 123 n.3.

irrelevant.  *See United States v. Matthies*, 319 Fed. Appx. 554, 557 (9th Cir. 2009).  As explained above, Wallace's grand jury testimony was not hearsay because it was offered solely to impeach her trial testimony, and thus was not subject to the *Crawford* requirements of unavailability and prior opportunity for cross-examination.  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

E.      *Ineffective Assistance of Counsel (Claim III)*

Petitioner next contends that his appellate counsel was ineffective for failing to adequately brief an issue on appeal.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.      *Clearly Established Law*

The Sixth Amendment right to counsel and the right to effective assistance of counsel protect the fundamental right to a fair trial.  *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).  To establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense.  *Id*. at 687.  These two components are mixed questions of law and fact.  *Id*. at 698.  Further, "[t]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one."  *Id.* at 697.  If "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed."  *Id.*  With respect to appellate counsel, a showing of prejudice requires a showing that petitioner's claims would have succeeded on appeal.  *See Smith v. Robbins*, 528 U.S. 259, 285-86 (2000); *McCleese v. United States*, 75 F.3d 1174, 1180 (7th Cir. 1996).

2.      *Analysis*

Petitioner claims that his appellate attorney was ineffective for failing to properly challenge the trial court's admission of Johnson's testimony regarding his mother's statements. At trial, Johnson testified, over a hearsay objection, that his mother told him that Wallace had visited her and told her that Johnson was in "big trouble." At the time Johnson testified to these matters, the trial court gave a limiting instruction, informing the jury that the statements of Johnson's mother could not be considered for their truth, but only to shed light on Johnson's state of mind. *See* Trial Tr., Vol. IV, at 41-42.[4] Appellate counsel raised this issue on appeal, but did so inadequately. The Michigan Court of Appeals "decline[d] to address" this claim because counsel "insufficiently briefed this claim." *Jackson*, 2004 WL 2913643, at *1, slip op. at 2. Petitioner contends that appellate counsel was ineffective for failing to properly brief this claim. The Court should conclude that petitioner is not entitled to habeas relief on this claim.[5]

As noted above, in order to succeed on an ineffective assistance of appellate counsel claim, petitioner must show a reasonable probability that the underlying claim that counsel failed to raise–or, in this case, improperly raised–would have succeeded on appeal. Petitioner cannot make this showing. In rejecting petitioner's motion for relief from judgment, the trial court concluded that Johnson's testimony was not hearsay because it was not offered to prove the truth of the matter

---

[4]The prosecutor theorized that Johnson's fear of petitioner accounted for the inconsistencies in the various statements he gave regarding the murders, and that Wallace's visit to Johnson's mother in part induced this fear.

[5]The Court should reject respondent's argument that this claim is procedurally defaulted. Respondent argues that the claim relating to Johnson's testimony is defaulted because the court of appeals declined to address the claim on appeal. However, petitioner is not raising the underlying claim, but a claim that appellate counsel was ineffective for failing to properly brief the underlying claim. Thus, the default of the underlying claim is the very basis upon which petitioner rests her ineffective assistance claim. The default of the underlying claim therefore provides no basis for finding the appellate counsel claim defaulted.

asserted, but rather to show his state of mind and the effect Wallace's visit to his mother had on his

state of mind.  The court explained that

> Johnson's state of mind was a critical issue in the case. . . . Johnson believed that the
> Defendant had sent Wallace to represent and silence him.  Johnson feared for his life.
> This evidence regarding Johnson's state of mind explained why he gave so many
> subsequent inconsistent statements about Defendant's involvement in these two
> murders.  There is no merit to Defendant's assertion that Johnson's state of mind was
> not a relevant issue.

*People v. Jackson*, No. 99-3987, at 2 (Wayne County, Mich., Cir. Ct. Jan. 5, 2007).  Although the

question of whether counsel was ineffective raises an issue of federal constitutional law, the

underlying question of the admissibility of the evidence is an issue of state law.  Here, the state court

determined that the evidence was admissible as a matter of state law.  In analyzing petitioner's

ineffective assistance of counsel claims, this expression of state law is binding on this Court.  *See*

*Basile v. Bowersox*, 125 F. Supp. 2d 930, 960 (E.D. Mo. 1999).  *See generally*, *Estelle v. McGuire*,

502 U.S. 62, 67-68 (1991); *Sarausad v. Porter*, 503 F.3d 822, 824 (9th Cir. 2007) ("A determination

of state law by a state appellate court is . . . binding in a federal habeas action.").  Because the state

court determined that the evidence was admissible as a matter of state law, petitioner cannot show a

reasonable probability that his claim would have succeeded on appeal had it been properly presented

by counsel.[6]  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on

this claim.

F.      *Prosecutorial Misconduct (Claim IV)*

---

[6]Petitioner does not contend that this evidence was inadmissible under the Confrontation
Clause, for good reason.  Neither Wallace's statements to Johnson's mother, nor the statements of
Johnson's mother to him, constitute "testimonial" hearsay under *Crawford.  See Doan v. Carter*, 548 F.3d
449, 458 (6th Cir. 2008) (victim's statements to family and friends regarding abuse she had received at
hands of petitioner not testimonial); *United States v. Franklin*, 415 F.3d 537, 545-46 (6th Cir. 2005) (citing
cases) (casual statements to family and acquaintances nontestimonial under *Crawford*).

Finally, petitioner contends that he was denied a fair trial by prosecutorial misconduct. Specifically, he claims that the prosecutor improperly argued that the jury should use Wallace's grand jury testimony, which had been admitted solely for impeachment purposes, as substantive evidence. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.      *Procedural Default*

At the outset, petitioner's claim is barred by her procedural default in the state courts. Under the procedural default doctrine, a federal habeas court will not review a question of federal law if the state court's decision rests on a substantive or procedural state law ground that is independent of the federal question and is adequate to support the judgment. *See Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991); *Wainwright v. Sykes*, 433 U.S. 72, 81 (1977). Habeas review of such a claim is barred "unless the habeas petitioner can show 'cause' for the default and 'prejudice attributable thereto,' or demonstrate that failure to consider the federal claim will result in a 'fundamental miscarriage of justice.'" *Harris v. Reed*, 489 U.S. 255, 262 (1989) (citations omitted).

Here, petitioner's prosecutorial misconduct claim is barred by petitioner's procedural default in the state courts. The Michigan Court of Appeals found that a review of these claims was barred by petitioner's failure to object to prosecutor's misconduct in the trial court, and thus that the claim was reviewable only for plain error. *See Jackson*, 2004 WL 2913643, at *2, slip op. at 3. This contemporaneous objection rule was firmly established at the time of petitioner's trial. *See, e.g.*, *People v. Duncan*, 402 Mich. 1, 15-16, 260 N.W.2d 58, 61-62 (1977); *People v. Curry*, 175 Mich. App. 33, 39, 437 N.W.2d 310, 314 (1989). As the state court clearly and expressly relied on this state procedural rule with respect to petitioner's prosecutorial misconduct claim, this claim is barred absent a showing of either cause and prejudice or a fundamental miscarriage of justice. *See Engle v. Isaac*, 456 U.S. 107, 125-129 (1982) (state contemporaneous objection rule is adequate procedural bar

precluding consideration of habeas claims).

Further, this conclusion is not altered by the fact that the Michigan Court of Appeals did consider the merits of petitioner's prosecutorial misconduct claim. It is clear that the court of appeals did so only in the context of determining whether petitioner could establish plain error to overcome his procedural default. "[P]lain error review by the state court does not constitute a waiver of procedural default rules." *White v. Mitchell*, 431 F.3d 517, 525 (6th Cir. 2005); *see also*, *Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001). Petitioner does not assert any cause for her procedural default. Accordingly, the Court should conclude that petitioner's prosecutorial misconduct and jury instruction claims are procedurally defaulted.[7] Alternatively, as explained below, the Court should reject the claim on the merits.

2.    *Clearly Established Law*

For habeas relief to be warranted on the basis of prosecutorial misconduct, it is not enough that the prosecutor's conduct was "undesirable or even universally condemned." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). Rather, the misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* (internal quotation omitted). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). In determining whether the prosecutor's conduct was so egregious as to warrant habeas relief, a court should consider "the degree to which the remarks

---

[7]Petitioner argues in her reply brief that the claim is not defaulted because in her appeal she "challenged the closing argument not only in the context of [her] prosecutorial misconduct claim, but also in the context of her confrontation claim." Pet'r's Reply Br., at 9. Therefore, petitioner argues, "[t]his Court is . . . precluded from considering the closing argument in deciding whether [her] right to confrontation was violated." *Id.* As explained above, however, *see supra* note 2, the prosecutor's alleged improper use of the impeachment evidence raises not a confrontation claim, but an analytically distinct prosecutorial misconduct claim.

complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury; and the strength of the competent proof to establish the guilt of the accused." *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (internal quotations and citations omitted). In sum, to constitute a denial of due process the prosecutor's conduct must be "so pronounced and persistent that it permeates the entire atmosphere of the trial." *Id*. (internal quotation omitted).

3.    *Analysis*

Petitioner argues that the prosecutor impermissibly used Wallace's grand jury testimony as substantive evidence that Wallace in fact knew petitioner prior to February 1999. The Michigan Court of Appeals, applying plain error review, rejected this claim. The court explained that the prosecutor's comments in rebuttal were responsive to defense counsel's argument concerning the discrepancy between Wallace's grand jury and trial testimonies, and was argued as a point of credibility rather than as substantive evidence. *See Jackson*, 2004 WL 2913643, at *2, slip op. at 3. The court of appeals also rejected petitioner's argument that, without the grand jury testimony, "the prosecutor lacked any substantive evidence to argue that she asked Wallace to provide representation for Johnson in his weapon case." *Id*. at *3, slip op. at 4. The court reasoned:

> The prosecutor suggested in closing argument that it would have been an unbelievable coincidence for Wallace, a California attorney, to be contacted to represent Johnson in his weapons case and to thereafter represent defendant at her preliminary examination in the instant case. Although not the only inference that could be made from the evidence, we agree with the trial court's conclusion, when denying defendant's motion for a new trial, that the inference was reasonable. A prosecutor is free to argue the evidence and all reasonable inference arising from it, as it relates to the theory of the case.

*Id*. A review of the transcript and the context in which the prosecutor's comments were made confirms the reasonableness of this determination.

During closing argument, the prosecutor argued that Wallace and petitioner had a preexisting relationship, and that Jackson arranged for Wallace to represent Johnson to keep Johnson quiet about the murders:

> Angela Wallace. Rather a significant witness in this case, even though her testimony didn't take very long. Angela Wallace attempts to represent Ronney Johnson by sending attorney Clarence Tucker, who's a local attorney here in Detroit, and you saw him on that video that we played, the arraignment of Ronney Johnson for his gun charge over at 36th District Court. Now Angela Wallace's testimony to you is well, gee, you know, we just – I just happened to get a call from a family member of Ronney Johnson, and I tried to represent him by calling my friend Clarence Tucker in Detroit. Okay. Ronney Johnson rejects her representation because he knows that Angela Wallace has been to his mother's home and he's never heard of Angela Wallace before.
>
> Now, April 23, gee, guess who's representing Christine Jackson? Angela Wallace. When she says yeah, I just happened to get a phone call from somebody in California that knows Angela Wallace and came out here and represented her and the two were unrelated. All the lawyers in the world and these two people just happened to rep – call Angela Wallace. That didn't happen.
>
> Just think about it for a moment. Why did Angela Wallace really come out here and try to represent Ronney Johnson? The reason is because Christine Jackson arranged to have Angela Wallace represent Ronney Johnson. Why would she do that? This some of the most compelling evidence in the case. Because Christine Jackson wants to get a lawyer to Ronney Johnson and dummy him up, that's why. She wants to get a lawyer, who's going to be faithful to Christine Jackson, to Ronney Johnson and shut him up. And we know that she's loyal to Angela – I mean, Christine Jackson because she winds up representing Christine Jackson through the preliminary examination actually until she gets into this building, but she doesn't represent her anymore. She's a witness in this case now.

Trial Tr., Vol. VIII, at 83-85. In his argument, the prosecutor did not mention Wallace's prior inconsistent statement, much less argue that it constituted substantive evidence. Rather, the prosecutor was arguing that Wallace's testimony regarding how she came to represent Johnson was incredible and that a common sense inference from the evidence was that petitioner attempted to have Wallace represent Johnson. "[I]t is well established that juries are allowed to draw upon their own experience in life as well as their common sense in reaching their verdict. While common sense is no substitute for evidence, common sense should be used to evaluate what reasonably may be inferred

from circumstantial evidence." *U.S. v. Durham*, 211 F.3d 437, 441 (7th Cir. 2000) (internal quotation omitted). Thus, the prosecutor was permitted to urge the jury to use its common sense in evaluating the credibility of the witnesses' testimony. *See United States v. Catano*, 65 F.3d 219, 228 (1st Cir. 1995); *United States ex rel. Hamilton v. Ellingsworth*, 629 F. Supp. 356, 366 (D. Del. 1988). The prosecutor's argument was a fair inference from the evidence, and thus permissible. *See Martin v. Foltz*, 773 F.2d 711, 717 (6th Cir. 1985) (prosecutor may argue permissible inferences from the evidence).

During his own closing argument, defense counsel brought out Wallace's prior testimony in the California case, arguing that she was merely mistaken in her testimony regarding the date she first met petitioner, and in any event even if she lied in her testimony, the jury still could not accept Johnson's testimony because it too was incredible. *See* Trial Tr., Vol. VIII, at 175-77. The prosecutor then addressed this issue during rebuttal argument. After rereading Wallace's responses to the prosecutor's questions at trial, the prosecutor argued:

> Same question asked three different ways. Okay? No mistake there, Mr. Pitts. No mistake. Don't try to say Miss Wallace made a mistake here because she didn't. Miss Wallace lied for Christine Jackson in this trial. The reason that she lied was because Christine Jackson sent Angie Wallace to dummy up Ronney Johnson.

*Id*. at 199. The prosecutor then read the jury Wallace's grand jury testimony in the California case, and continued:

> Angela Wallace lied to you when she said she never represented Christine Jackson before. When she sat on that witness stand and tried to tell you, oh, you know what, it was just a coincidence that Ronney Johnson's family contacted me.

*Id*. at 201. At this point, the prosecutor had argued nothing more than that Wallace's prior testimony showed that she had lied at trial. Thus, the prosecutor used it only as impeachment evidence, not as substantive evidence. The prosecutor then played a brief portion of the videotape of Johnson's

arraignment on the gun charge, and quoting from that video continued:

> "I was retained by Angela Wallace." Angela Wallace sent Clarence Tucker, this man right here, over to 36th District Court when Ronney Johnson was getting arraigned on his gun case. Do you know why? Because Christine Jackson sent Angie Wallace to do that. Angie Wallace lied to you when she said she had never known Miss Jackson before. Miss Jackson sent Angie Wallace to try to represent Ronney Johnson when he got arrested for that gun case. And do you know why? Because that woman right there knew that Ronney Johnson could spill the beans on her. Could tell a jury like you what she did and that's why she hired Angie Wallace to get Clarence Tucker to show you [sic] and try to represent Ronney Johnson because she knew that Ronney Johnson could hurt her. That's how much fear Christine Jackson had about Ronney Johnson.

*Id.* at 201-02. Here, the prosecutor did argue as a substantive matter that petitioner had sent Wallace to represent Johnson. This argument, however, was not based on any substantive use of Wallace's prior testimony. Rather, it was based on the video showing Tucker attempting to represent Johnson at the arraignment and the same common sense inference that the prosecutor argued during closing argument. The prosecutor merely argued that Wallace had lied at trial, and then provided a common sense inference as to why she had lied. At no point did the prosecutor argue that the jury should accept as true, or as substantive evidence, Wallace's grand jury testimony in the California case. Thus, the prosecutor did not improperly use Wallace's grand jury testimony as substantive evidence of petitioner's guilt, and the Court should conclude that petitioner is not entitled to habeas relief on this claim.

G.      *Recommendation Regarding Certificate of Appealability*

1.      *Legal Standard*

As amended by the Antiterrorism and Effective Death Penalty Act, section 2253 provides that a petitioner may not appeal a denial of an application for a writ of habeas corpus unless a judge issues a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1). The statute further provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the

denial of a constitutional right." 28 U.S.C. § 2253(c)(2). As the Sixth Circuit has noted, this language represents a codification of the Supreme Court's decision in *Barefoot v. Estelle*, 463 U.S. 880 (1983), and "[t]he AEDPA thus makes no change to the general showing required to obtain a certificate[.]" *Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063, 1073 (6th Cir. 1997); *accord Slack v. McDaniel*, 529 U.S. 473, 483 (2000). Although the statute does not define what constitutes a "substantial showing" of a denial of a constitutional right, the burden on the petitioner is obviously less than the burden for establishing entitlement to the writ; otherwise, a certificate could never issue. Rather, the courts that have considered the issue have concluded that "'[a] substantial showing requires the applicant to "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further."'" *Hicks v. Johnson*, 186 F.3d 634, 636 (5th Cir. 1999) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir. 1996) (quoting *Barefoot*, 463 U.S. at 893 n.4)); *accord Slack*, 529 U.S. at 483-84. Although the substantive standard is the same, "[t]he new Act does, however, require that certificates of appealability, unlike the former certificates of probable cause, specify which issues are appealable." *Lyons*, 105 F.3d at 1073. (citing 28 U.S.C. § 2253(c)(3)).

Effective December 1, 2009, the newly created Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), 28 U.S.C. foll. § 2254. The rule tracks § 2253(c)(3)'s requirement that any grant of a certificate of appealability "state the specific issue or issues that satisfy the showing required by § 2253(c)(2)," Rule 11(a), but omits the requirement contained in the pre-amendment version of Federal Rule of Appellate Procedure 22(b)(1) that the court explain "why a certificate should not issue." FED. R. APP. P. 22(b)(1) (version effective prior to 2009 amendment); *see id.*, advisory committee note,

2009 amendments. In light of the new Rule 11 requirement that the Court either grant or deny the certificate of appealability at the time of its final adverse order, I include a recommendation regarding the certificate of appealability issue here.

2. *Analysis*

If the Court accepts my recommendation regarding the merits of petitioner's claims, the Court should grant in part and deny in part a certificate of appealability. Specifically, the Court should grant a certificate with respect to petitioner's confrontation claims, and deny a certificate with respect to petitioner's ineffective assistance of counsel and prosecutorial misconduct claims.

With respect to the confrontation claims, as noted above I recommend that the Court conclude these claims are without merit because Wallace's grand jury testimony was not offered to prove the truth of the matter asserted, and thus does not constitute testimonial hearsay. Although this conclusion follows from the holding in *Crawford*, in my view, neither the Supreme Court nor the Sixth Circuit has provided any guidance on how a habeas court should go about reviewing a state court determination that a particular out-of-court assertion was not hearsay because it was not offered to prove the truth of the matter asserted. Without such guidance from the Supreme Court and Sixth Circuit, and with a dearth of caselaw on this matter from other courts, it is difficult to conclude that my recommended resolution of this claim is not fairly debatable among jurists of reason. Accordingly, the Court should grant a certificate of appealability with respect to petitioner's confrontation claims.[8]

---

[8]As explained above, petitioner's second confrontation claim–asserting that the state courts' finding that Wallace was unavailable was incorrect–is irrelevant if Wallace's grand jury testimony does not constitute testimonial hearsay barred by the Confrontation Clause. If, however, the Sixth Circuit were to conclude that Wallace's testimony was offered to prove the truth of the matter asserted and thus constituted testimonial hearsay, petitioner's second confrontation claim would again be at issue. Thus, if the Court grants a certificate of appealability on the first confrontation claim, it should likewise grant

The resolution of petitioner's remaining claims, however, is not reasonably debatable. As explained above, in rejecting petitioner's motion for relief from judgment the trial court concluded that Johnson's testimony regarding his mother's statements to him were admissible as a matter of state law. Because it is beyond debate that this determination of state evidence law is binding on this Court in analyzing petitioner's ineffective assistance of counsel claim, it is likewise not reasonably debatable that petitioner has failed to show that appellate counsel was ineffective for failing to properly brief this claim on appeal. With respect to petitioner's prosecutorial misconduct claim, it is not reasonably debatable that this claim is procedurally defaulted. The Michigan Court of Appeals noted that counsel had failed to object to the prosecutor's statements during closing and rebuttal argument, and therefore reviewed the claim only for plain error. Under the Sixth Circuit's cases, it is clear that this constitutes a procedural default. Further, on the merits, the transcript shows that, when viewed in context, the prosecutor did nothing more with Wallace's grand jury testimony than use it to impeach the credibility of her trial testimony. The prosecutor's comments regarding Jackson having hired Wallace to represent petitioner were not based on substantive use of Wallace's prior grand jury testimony, but on a common sense inference which the prosecutor asked the jury to draw. Therefore, the resolution of this claim is not reasonably debatable.

H.      *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law. Accordingly, the Court should deny petitioner's application for the writ of habeas corpus. If the Court accepts this recommendation, the

---

one on the second claim.

Court should grant a certificate of appealability with respect to petitioner's confrontation claims and should deny a certificate of appealability with respect to petitioner's ineffective assistance and prosecutorial misconduct claims.

III.     NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in FED. R. CIV. P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.


                                        s/Paul J. Komives
                                        PAUL J. KOMIVES
                                        UNITED STATES MAGISTRATE JUDGE

Dated: 4/12/10

The undersigned certifies that a copy of the foregoing order was served on the attorneys of record    by electronic means or U.S. Mail on April 12, 2010.

s/Eddrey Butts
Case Manager